**CONTROL DATA SYSTEMS,
INC., Plaintiff,**

v.

**INFOWARE, INC., Defendant.**

Civ. No. 3–95–516.

United States District Court,
D. Minnesota,
Third Division.

Aug. 17, 1995.

---

Thomas S. Fraser, Fredrikson & Byron, Minneapolis, MN, Thomas M. Parry, Jr., Tobey B. Marzouk, Marzouk & Parry, Washington, DC, for plaintiff.

Douglas J. Williams, Merchant & Gould, Minneapolis, MN, Betsy E. Bayha, Robert H. Sloss, General Counsel Assoc., Mountain View, CA, for defendant.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

### I. INTRODUCTION

This matter is before the Court upon Plaintiff Control Data System Inc.'s Motion for Preliminary Injunction. For the following reasons, the Court grants Plaintiff's motion.

### II. BACKGROUND [1]

Plaintiff Control Data Systems, Inc. ("Control Data") filed this motion seeking to enjoin

---

1. Because this motion involves material subject to a protective order, this Memorandum and

Defendant Infoware, Inc. ("Infoware") from committing acts that Control Data maintains infringe on its copyright in its Network Operating System ("NOS") software and the Fortran Extended Compiler (collectively referred to as "NOS"). NOS enables application software to run on Control Data's Cyber mainframe computers. For the purposes of this motion, Infoware does not contest Control Data's ownership in the copyrights pertaining to NOS. (Def.'s Mem.Opp.Prelim.Inj. at 11.) Infoware opposes the motion on the basis that it has not infringed and is not likely to infringe on Control Data's copyright.

Control Data previously employed two of the founders of Infoware. George F. Filey worked at Control Data from 1972 to 1980, and Donald F. Linton worked there from 1976 to 1982. Infoware recently introduced a product known as "AlphaCyber," which is designed to be an "emulator" of NOS. The purpose of the emulator is to permit customers to use application programs designed for NOS on hardware other than the Cyber computer line.

## III. DISCUSSION

Control Data seeks a preliminary injunction to prevent infringement of its copyright. Pursuant to 17 U.S.C. § 502(a), this Court has authority to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."

The Eighth Circuit has established the following analysis to be used in considering a preliminary injunction motion:

> [W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981); *accord Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085,

1090 (D.Minn.1981), *aff'd,* 684 F.2d 565 (8th Cir.1982). As this Court has previously noted, "no one of the four *Dataphase* factors is determinative.... In a copyright infringement case, however, the reasonable likelihood of success on the merits prong of *Dataphase* is predominant." *E.F. Johnson Co. v. Uniden Corp. of Am.,* 623 F.Supp. 1485, 1491 (D.Minn.1985) (citations omitted).

### A. Likelihood of Success on the Merits

In order to succeed on the merits of its claim of copyright infringement, Control Data must meet two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Pubs. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1295, 113 L.Ed.2d 358 (1991). Because Infoware concedes for the purposes of this motion that Control Data owns a valid copyright with respect to NOS, only the second element is in issue.

#### 1. Copying of NOS

In examining the second element of a copyright infringement claim, a court must consider two questions:

> 1) whether the defendant, as a factual matter, copied portions of the plaintiff's program; and 2) whether, as a mixed issue of fact and law, those elements of the program that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable.

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 832 (10th Cir.1993). If the plaintiff is unable to produce direct evidence of copying, it may instead rely on indirect evidence that first, the defendant had access to the copyrighted material, and second, that there are "probative similarities" between the copyrighted program and the allegedly infringing material. *Id.; see also E.F. Johnson Co. v. Uniden Corp. of Am.,* 623 F.Supp. 1485, 1492 (D.Minn.1985). "Ultimately, to prove factual copying, the plaintiff must come forward with sufficient evidence that a rea-

---

Order will not contain a detailed statement of the relevant facts. The legal analysis and factual descriptions that follows will suffice to apprise the parties of their rights and duties at this juncture.

sonable factfinder, taking together the evidence of access and the similarities between the programs, could find that the second work was copied from the first." *Gates Rubber*, 9 F.3d at 833.

■ Evidence that a defendant had an " 'opportunity to view or to copy' " the protected program suffices to establish that the defendant had access to the protected program. *Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 942 (8th Cir.1992) (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir.1977)). The plaintiff must show that there was a reasonable possibility, not just a bare possibility, that the defendant was able to observe the protected material. *Id.*

■ Control Data asserts that the founders of Infoware, Riley and Linton, had access to the copyrighted NOS software while they were employed at Control Data. (Pltf.'s Mem.Supp.Prelim.Inj. at 12.) Control Data also points out that Infoware would have access to the NOS source code "through entities using Cyber computers, which would necessarily require Control Data's NOS." (*Id.*) Finally, Control Data argues that Infoware has admitted using manuals such as the "Systems Programmer's Instant," which contain excerpts of NOS source code.[2]

Infoware denies that these facts are sufficient to show access. It states that Riley and Linto both left Control Data over thirteen years ago, and that neither of them took a copy of the NOS source code with him. As to the Cyber computers, Infoware maintains that its employees have worked only 13.5 hours with Cyber computers since 1990, and that Infoware did not retain a copy of the NOS source code in any digital or written format. (Def.'s Mem.Opp.Prelim.Inj. at 12.) The excerpts of source code in the manuals, Infoware contends, were not copied, but simply referred to in order to gain a deeper understanding of NOS.

Based on a review of the facts as the record stands at this time, the Court is persuaded that Control Data has met its burden of showing Infoware had access to NOS source code. The prior employment with Control Data and the access to manuals containing the NOS source code demonstrate a reasonable possibility that Defendant had an opportunity to review the copyrighted material.

■ The Court next considers whether there are "probative similarities" between the NOS source code and the AlphaCyber source code. Control Data asserts that the AlphaCyber source code is substantially similar to the NOS source code. The specific similarities alleged include "(1) direct or literal copying of lines of the NOS source code; (2) copying of the NOS input and output formats; (3) copying of the NOS file layouts; (4) copying of NOS source code parameters; (5) copying of NOS commands; and (6) other indicia of copying." (Pltf.'s Mem.Supp.Prelim.Inj. at 12.) Upon reviewing the Copyright Infringement Report authored by Robert E. Tate and submitted by Control Data, the Court finds that the similarities in these areas are indeed substantial and constitute probative evidence of copying.[3]

A defendant may rebut indirect proof of copying by showing evidence that defendant's work was the result of independent creation. *Gates Rubber*, 9 F.3d at 833 n. 8. Infoware attempts to counter Control Data's evidence by claiming that it relied on the reference manuals for the NOS operating system and also used "reverse engineering." (Def.'s Mem.Opp.Prelim.Inj. at 5–6.) This evidence is insufficient to rebut the presumption that copying occurred.

---

2. In its reply brief, Control Data makes the surprising claim that "The purpose of a copyright is to protect even those documents in the public domain." (Pltf.'s Reply at 1.) The Court assumes that Control Data intended to state that copyright protects even those documents that are freely available to the public. "Public domain" is usually used to describe "[l]iterary, musical, or dramatic compositions so dedicated to the public as not to be subject to copyright." James A. Ballentine, *Ballentine's Law Dictionary* 1021 (William S. Anderson, ed.) (1969).

3. As noted above, the Court refrains from a more detailed description of its review of the two programs in order to preserve the confidentiality of the information shielded by protective order.

Based on its examination of the facts, the Court is convinced that there is a substantial likelihood that Control Data will succeed in establishing that copying occurred. The next question, then, is whether the portions of NOS that were copied are protectable under copyright law and whether they are of such importance to NOS that the appropriation is actionable. *Gates Rubber,* 9 F.3d at 832.

### 2. Protectability of Elements of NOS

■ Copyright protection extends only to expression, not to ideas. *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 703 (2nd Cir.1992). The Copyright Act specifically provides, "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b).

■ Although it is sometimes difficult to distinguish between an idea and the expression of that idea, such distinction is essential to determining whether a plaintiff's material is protected. *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1443 (9th Cir. 1994). Courts have treated features that " " "as a practical matter [are] indispensable, or at least standard, in the treatment of a given [idea]" ' " as ideas, and therefore not protected by copyright. *Id.* at 1444 (quoting *Frybarger v. Int'l Bus. Mach. Corp.,* 812 F.2d 525 (9th Cir.1987) (quoting *Atari, Inc. v. North Am. Philips Consumer Elecs. Corp.,* 672 F.2d 607, 616 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982))).

■ There is no question that source codes for computer programs may be protected by copyright. *Computer Assocs.,* 982 F.2d at 702. A number of courts have developed a method known as the "Abstraction–Filtration–Comparison" test for evaluating the protectability of elements of a computer program.[4] *See, e.g., Lotus Development*

*Corp. v. Borland Int'l, Inc.,* 49 F.3d 807, 814–15 (1st Cir.1995); *Eng'g Dynamics, Inc. v. Structural Software, Inc.,* 26 F.3d 1335, 1342 (5th Cir.1994); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 834 (10th Cir.1993); *Computer Associates Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693 (2nd Cir.1992). The Tenth Circuit described the test as follows:

> First, in order to provide a framework for analysis, we conclude that a court should dissect the program according to its varying levels of generality as provided in the abstractions test. Second, poised with this framework, the court should examine each level of abstraction in order to filter out those elements of the program which are unprotectable. Filtration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, *scenes a faire* material, and other unprotectable elements suggested by the particular facts of the program under examination. Third, the court should then compare the remaining protectable elements with the allegedly infringing program to determine whether the defendants have misappropriated substantial elements of the plaintiff's program.

*Gates Rubber,* 9 F.3d at 834.

#### a. Abstraction

By applying the abstractions test, a computer program can usually be broken into the following six levels of declining abstraction: "(i) the main purpose, (ii) the program structure or architecture, (iii) modules, (iv) algorithms and data structures, (v) source code, and (vi) object code." *Gates Rubber,* 9 F.3d at 835. As noted above, Control Data alleges that the AlphaCyber program infringes on the following elements of NOS: (1) lines of the NOS source code; (2) input and output formats; (3) file layouts; (4) source code parameters; and (5) commands. (Pltf.'s Mem.Supp.Prelim.Inj. at 12.) Infoware does not contest the use of these elements as the levels of abstraction that should be reviewed

---

4. The Third Circuit adopted a different test for distinguishing between idea and expression in *Whelan Assocs. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222 (3rd Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). The recent trend in cases reveals that the abstraction-

filtration-comparison test has gained wider acceptance than the *Whelan* approach. Although the court analyzes the facts before it under the abstraction-filtration-comparison test, it is likely that the same result would attain under *Whelan.*

by the Court, although it criticizes Control Data's affidavits in support of its allegations related to those elements. (Def.'s Mem.Opp.Prelim.Inj. at 17.)

### b. Filtration

The second step in determining which elements of a computer program are protectable is filtration. In this step, the portions of the program that are not protected by copyright are "filtered" out of the analysis. *Gates Rubber*, 9 F.3d at 836. The Court removes from consideration any elements of the program that constitute "ideas" rather than expression, facts, processes, and any elements that are unoriginal or in the public domain. *Id.* at 836–38. The levels of the program that are most abstract, such as the main purpose of the program, are unprotectable ideas. "At the other end of the abstractions spectrum, source and object code, which are the literal elements of a program, will almost always be found to be protectable expression unless the doctrines of merger and *scenes a faire* come into play." *Id.* at 836.

The merger doctrine denies copyright protection to any "expression that is inseparable from or merged with the ideas, processes, or discoveries underlying the expression." *Id.* at 838. The purpose of the merger doctrine is "to ensure that courts do not unwittingly grant protection to any idea by granting exclusive rights to the only, or one of only a few, means of expressing that idea." *Id.*

The *scenes a faire* doctrine prevents a programmer from obtaining a copyright to "expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting." *Id.* The doctrine also denies protection to expressions that are dictated by external factors. *Id.* Examples of external factors are hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices and demands, and computer industry programming practices. *Id.; see also Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 709–10 (2nd Cir.1992).

Infoware argues that the similarities that exist between its program and NOS are "dictated by the fact that the purpose of AlphaCyber, or its 'idea,' is to function just like NOS." (Def.'s Mem.Opp.Prelim.Inj. at 18.) It argues that the elements that are necessary to the idea of making a product function like NOS are "irretrievably merged into that idea and must be filtered from the analysis." (*Id.*)

Control Data challenges Infoware's approach to the merger doctrine. The appropriate analysis, Control Data proposes, is to compare the idea of NOS, that is, the idea of making an operating system for the Cyber computer, with the expression of that idea as embodied in NOS. Because there are many different ways in which the allegedly copied elements of NOS could have been expressed, it asserts, those elements are protectable, and the merger doctrine does not apply. Control Data's argument is persuasive.

Infoware's reliance on the "externalities doctrine" is similarly flawed. The question to be examined is whether external factors limited the choices available to NOS programmers, not whether external factors may somehow limit the choices of AlphaCyber programmers. As Control Data points out, Infoware fails to list any external factors that limited the freedom of expression of the programmers who wrote NOS.

### c. Comparison

After abstraction and filtration, the next step in the protectability analysis is comparison of the remaining elements with the alleged infringing program. *Gates Rubber*, 9 F.3d at 838–39. If this comparison reflects copying of substantial protected portions of plaintiff's program, plaintiff will succeed on its infringement claim. The amount of copying need not be great in a quantitative sense, but must have qualitative significance with respect to plaintiff's program. "The analysis at this point 'poses essentially a value judgment, involving an assessment of the importance of the material that was copied.'" *Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1496 (10th Cir. 1993).

Infoware argues that, after filtration, nothing remains of the NOS program to be compared, and therefore the third step of the analysis is inapplicable. Because the Court concludes that protectable elements remain after filtration, the comparison test must be applied.

■ Control Data estimates that over 2,000 lines of NOS source code were copied in AlphaCyber. Even if this number far exceeds the actual number of lines of protected material that were copied, the Court is convinced that there is a substantial likelihood that Control Data will be able to demonstrate that the protected portions of NOS that were copied are qualitatively significant to NOS. *Cf. SAS Institute, Inc. v. S & H Computer Sys., Inc.*, 605 F.Supp. 816, 822, 829–30 (substantial similarity existed where only 44 lines out of 186,000 were directly copied).

### 3. Unclean Hands

■ Infoware claims Control Data's claims are barred by the doctrine of "unclean hands" because Control Data breached an agreement under which it obtained the AlphaCyber source code. Infoware argues that Control Data agreed to resolve disputes outside of litigation. (Def.'s Mem.Opp.Prelim.Inj. at 31.) Control Data contests Infoware's reading of the agreement, taking the position that the "disputes" referred to in the provision relied upon by Infoware were solely those disputes arising out of the agreement, not all disputes that might arise between Control Data and Infoware. Control Data's reading of the agreement is the better of the two.

Despite Infoware's claims to the contrary, the Court also finds no support for a claim of breach based on Control Data's duty to communicate with Infoware. Control Data fulfilled its obligation under the agreement by orally discussing the infringement with Infoware. Based on a review of the facts and the arguments of the parties, the Court concludes that the unclean hands doctrine is not likely to bar Control Data's claims in this action.

### 4. Estoppel

Infoware next claims that Control Data should be estopped from asserting its claims because it used fraud to obtain the AlphaCyber source code. (Def.'s Mem.Opp.Prelim.Inj. at 31.) Again, the facts cited by Infoware are weak. The Court finds it unlikely that Infoware would succeed on an estoppel claim under the facts in this case.

Based on its review of the facts and the law as they have been presented at this stage of the proceedings, the Court concludes that there is a substantial probability that Control Data will succeed on the merits of its claim. This key factor, likelihood of success on the merits, therefore weighs in favor of Control Data's motion.

### B. Irreparable Harm

■ In copyright actions, the irreparable harm requirement is usually satisfied by a showing of copyright infringement. Thus, this factor is often not required in copyright litigation. *E.F. Johnson Co. v. Uniden Corp. of Am.*, 623 F.Supp. 1485, 1491 (D.Minn. 1985). The Court has already determined that there is a substantial likelihood that Control Data will succeed on its claims of infringement, and that alone could be enough to sustain Control Data's burden on this factor.

■ Control Data does not rely solely on the alleged infringement, however, for additional evidence of irreparable harm is apparent in this case. Infoware's product allows users of Control Data's Cyber line of computers to migrate to a new computer system without changing significant portions of the users' application software. (*See* Def.'s Mem.Opp.Prelim.Inj. at 5.) Control Data claims that, one a user makes this move, the user cannot return to the Cyber line without incurring significant expense because they will have invested in expensive new computer systems. To adjust to the reduction in business that would result from a reduced number of users, Control Data predicts that it would find it necessary to terminate employees.

In response to the argument that Cyber users will migrate to new systems, Infoware

asserts that any such migration is compensable by money damages. (Def.'s Mem.Opp.Prelim.Inj. at 27.) Any loss of employees, Infoware argues, would be "an inevitable by-product of competition and innovation." (*Id.*)

Infoware pounces upon the following admission by Control Data: "Control Data fully recognizes that most of its NOS customers eventually will seek to migrate to other hardware and operating systems. The infringing AlphaCyber product, however, allows Infoware unfairly to control and accelerate this migration, which, in the absence of AlphaCyber, would likely not occur for some time." (Pltf.'s Mem.Supp.Prelim.Inj. at 25.) Infoware's claim that this statement is effectively a concession that irreparable harm will not occur is off the mark. In the field of computer technology, nearly all products have a limited life span. The arrival of new programs and hardware will someday make every program obsolete. Copyright law seeks to protect the original expressions contained in computer software while they are not yet obsolete and bars infringers from unfairly hastening the end of their useful life.

■ Infoware also argues that Control Data's claims of irreparable harm are undermined by the fact that it waited several months to file its action and move for a preliminary injunction. (*Id.* at 10, 27–28.) It cites a number of cases, none of which are applicable to the facts in this case. In *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2nd Cir.1985), the plaintiff sought an injunction prohibiting the defendant from using a business name similar to plaintiff's on the grounds that it would create confusion. The court held that a delay of several weeks in bringing the suit undermined the plaintiff's claim of irreparable harm. 756 F.2d at 276. *Business Trends Analysts v. Freedonia Group, Inc.*, 650 F.Supp. 1452, 1459 (S.D.N.Y.1987), involved an alleged infringement of a copyrighted report on robotics. The plaintiff did not commence its action until over half a year after receiving a copy of the allegedly infringing report. A decision to sue in both *Citibank* and *Business Trends* could be reached much more quickly than in a case such as this one, however, where the

relevant law is still evolving and the facts are far more complex. *Central Point Software, Inc. v. Global Software & Accessories, Inc.*, 859 F.Supp. 640, 644–645 (E.D.N.Y.1994), which involves claims of copyright infringement, is more on point, but the delay in that case was much greater in length and not explained by the plaintiff. No extensive comparison of two computer programs or similarly difficult undertaking was required in that case.

Given the extremely complex nature of this action, the Court holds that Control Data's delay in filing suit does not preclude a finding of irreparable harm. Because irreparable harm is likely to occur if a preliminary injunction is not granted, this factor favors Control Data.

### C. Balance of Harms

■ Infoware argues that the balance of harms favors a denial of Control Data's motion because Infoware's business is heavily dependent upon the success of the AlphaCyber product. This is not a sufficient reason for denying the injunction, however. Several courts have noted that the balance of harms would often favor unjustifiably a company that bases its business upon a product it knows infringes on another's intellectual property rights. *See, e.g., Concrete Co. v. Classic Lawn Ornaments*, 843 F.2d 600 (1st Cir.1988); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240 (3rd Cir. 1983), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *see also E.F. Johnson Co. v. Uniden Corp. of Am.*, 623 F.Supp. 1485, 1491 (D.Minn.1985) (adopting this analysis). Because the Eighth Circuit has not expressly adopted this line of reasoning, *Hill v. Xyquad, Inc.*, 939 F.2d 627 (8th Cir.1991), the Court also considers other facts regarding the balance of harms.

Infoware claims that it is "a very small company" with gross revenues of approximately $300,000 last year. It alleges that it has invested nearly $300,000 in the development of AlphaCyber, and that the investment will be lost if Infoware is enjoined from selling its product. (Def.'s Mem.Opp.Prelim.Inj. at 28–29.)

At the present time, Infoware has very few customers for AlphaCyber. At oral argument, Infoware asserted that, if it is enjoined from selling its product at this time, it will never restart. The good will that would be lost could not be measured in terms of compensable damages, Infoware claims. As this Court has stated, however, "A willful infringer which seeks to profit by copying from others' creative ideas should not be heard to complain that its interests will be disturbed by an injunction." *E.F. Johnson Co. v. Uniden Corp. of Am.*, 623 F.Supp. 1485, 1504 (D.Minn.1985).

As noted above, Control Data stands to permanently lose customers for NOS if Infoware continues to market AlphaCyber. The amount of loss suffered in connection with such migration would be nearly impossible to quantify. The balance of harms weighs in Control Data's favor.

### D. Public Interest

▓▓▓▓▓ Finally, the public interest is furthered by enforcing copyright laws and preventing the infringement of copyrighted materials. *E.F. Johnson*, 623 F.Supp. at 1491. "A preliminary injunction enjoining copyright infringement serves the public interest by furthering the goals of individual effort and fair competition." *Id.; see also Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1499 (10th Cir.1993) ("In copyright cases, we think this factor normally weighs in favor of the issuance of an injunction because the public interest is the interest in upholding copyright protections."). Although Infoware is certainly correct in arguing that it is in the public interest to encourage competition and the development of new computer programs, it is not in the public interest to permit the marketing of a program that infringes on the intellectual property rights of another.

### E. Bond

As is all too often the case with respect to a motion for preliminary injunction, the parties have devoted almost no argument to the topic of an appropriate bond in this matter. Control Data requests that the bond be set at a mere $10,000. Given the significant impact that this action could have on the Defendant's business, however, the Court finds this amount is insufficient. Bond in the amount of $75,000 is appropriate in light of the circumstances of this case.

### IV. CONCLUSION

▓▓▓▓▓ Because each of the four *Dataphase* factors weighs in favor of Control Data, the Court concludes that Plaintiff's Motion for a Preliminary Injunction should be granted. Control Data shall post a bond in the amount of $75,000. Upon the posting of that bond, Defendant Infoware, its directors, officers, employees, and agents, and all persons acting in concert or participation with them, shall be enjoined from the following activities: using, authorizing the use of, reproducing, distributing, preparing derivative works based upon, disclosing, or distributing Control Data's NOS operating system software or any works derived therefrom; licensing, selling, distributing, or otherwise marketing Infoware's AlphaCyber software or any other NOS emulator that infringes upon Control Data's copyright in NOS; and infringing in any way Control Data's copyright in and to the NOS operating system software.

Accordingly, **IT IS HEREBY ORDERED** THAT:

1. Plaintiff Control Data System Inc.'s Motion for Preliminary Injunction (Clerk Doc. No. 4) is GRANTED;

2. Defendant Infoware, its directors, officers, employees, and agents, and all persons acting in concert or participation with them, are hereby enjoined from engaging in the following acts during the pendency of this action:

a. Using, authorizing the use of, reproducing, distributing, preparing derivative works based upon, disclosing, or distributing Control Data's NOS operating system software or any works derived therefrom;

b. Licensing, selling, distributing, or otherwise marketing Infoware's AlphaCyber software or any other NOS emulator that infringes upon Control Data's copyright in NOS; and

c. Infringing in any way Control Data's copyright in and to the NOS operating system software.

3. Plaintiff Control Data shall post a bond in the amount of $75,000 as security in accordance with Rule 65(c) of the Federal Rules of Civil Procedure. This order shall not take effect until this sum has been posted before the Clerk of Court.